**Charles S. BITTINGER, Individually and as a Representative of those Similarly Situated, a Class, Plaintiff,**

v.

**TECUMSEH PRODUCTS COMPANY and Tecumseh Division Group Insurance Plan for Retirees, Defendants.**

No. 94–CV–72283–DT.

United States District Court,
E.D. Michigan,
Southern Division.

July 16, 1998.

Ann C. Thompson, Kelman, Loria, Detroit, MI, for Charles S. Bittinger, plaintiff.

Diane M. Soubly, Butzel Long, Ann Arbor, MI, Daniel J. Bernard, Robert M. Vercruysse, James E. Roach, Vercruysse, Metz, Bingham Farms, MI, for Tecumseh Products Company, Tecumseh Division Group Insurance Plan for Retirees, defendants.

## *OPINION*

DUGGAN, District Judge

This matter is currently before the Court on defendants' motion for summary judgment. Plaintiff has filed a five count complaint setting forth the following claims: a breach of labor agreement claim brought under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185 and a breach of employee welfare plan claim under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et. seq.* (Count I); a claim for promissory and/or equitable estoppel (Count II); a claim for breach of fiduciary duty (Count III); a claim for "structural defect" under the LMRA and ERISA (Count IV); and a claim for "misrepresentation and willful concealment" (Count V). This class action suit, initiated by plaintiff Bittinger and former union hourly employees of the Tecumseh Division of defendant Tecumseh Products Company, seeks a declaration that all members of the class are entitled to fully funded lifetime retiree health care and life insurance benefits. On January 30, 1998, defendants filed four motions for summary disposition as to all of the plaintiff's claims.[1] The Court entertained oral argument on defendants' motion on June 19, 1998. For the following reasons, the Court grants summary judgment in favor of defendants on all of plaintiff's claims.

## *Background*

Plaintiff and members of his class, retirees of defendant Tecumseh Products Company ("the Company"), seek to establish that health and life insurance benefits conferred upon the retirees pursuant to a collective bargaining agreement ("CBA") were vested, fully funded "lifetime" benefits. The CBAs at issue in this case were entered into by members of the United Products Workers Union ("UPW") and the defendant Tecumseh. The benefits about which plaintiff complains were conferred in a CBA entered into among the parties in 1988 which expired on May 15, 1991. Upon the expiration of the 1988–1991 CBA, a strike ensued. At this juncture, the company issued COBRA notices to all UPW hourly retirees. According to defendant, "the COBRA notices advised retirees that their life insurance and medical coverage had been terminated as of May 16, 1991, and provided an opportunity for the retirees to continue their insurance coverage by paying the full premium." (Df.'s Mot.S.J. at 3).

Following the expiration of the 1991 agreement, in June 1991, the Company entered into a new labor contract under which no provision was made for retiree health or life insurance benefits. The Company then offered the retirees life and health insurance under a new plan the terms of which provided that the Company paid for approximately 75% of the premium. In order to enroll in the new insurance program, the employees were required to sign releases which purported to release any claims against the Company in exchange for acceptance of the terms of the insurance plan. Some, but not all, of the eventual class members executed the releases.

---

1. The motions filed by defendants address plaintiff's claims in the following format: defendants' motion for summary judgment as to Counts I and III of the plaintiff's complaint; defendants' motion for summary judgment as to Counts II and V; defendants' motion for summary judgment as to those plaintiffs who signed releases; and defendants' motion for summary judgment on time bar grounds. Plaintiff has indicated that he is not pursuing Count IV of his complaint. The Court will address plaintiff's claims in the manner and format in which they were briefed before the Court.

### The Documents

The history of collective bargaining between the UPW and the Company began with the negotiation and ratification of the first CBA agreement on September 1, 1965. The original agreement contained the following provision:

[T]he labor contract contemplates that during the period while the Labor Contract remains in force and effect the Company will establish and maintain an insurance program (herein called the Program), which will provide the Group Life, Extra Accident and Sickness and Accident Insurance Benefits and the Hospital and Medical Expense Benefits described in the booklet hereunto attached as Exhibit A.

(Df.'s Mot.S.J.Ex. 1).

Subsequent to the 1965 CBA agreement, the parties negotiated agreements in 1968, 1971, and 1975. The negotiation of each of the foregoing CBAs was memorialized in a "settlement agreement" which set forth the pertinent changes to the CBA agreement, but in other respects retained the unchanged provisions of the original agreement between the parties.

Negotiations with respect to the CBA were undertaken in 1978, 1981, 1984, and 1988. Beginning with the 1978 settlement agreement, the parties assented to the inclusion of the following clause: "All other provisions of the current Insurance Benefit Plan will remain unchanged and will be continued during the term of the new Agreement." (Df.'s Mot.S.J.Ex. 6 at 2). This language was retained in the 1981 settlement agreement with an added specification that stated, "All other provisions of the Retiree's [sic] insurance program remain unchanged during the term of the new Contract." (Df.'s Mot.S.J.Ex. 7 at 3).

In 1984, the Company and the UPW engaged in mid-contract concessionary bargaining, the result of which eliminated future retiree health and insurance coverage for those employees hired after May 15, 1984. The 1984 settlement agreement, in which substantial changes [2] were made to retiree benefits, added the following language: "All other provisions of the Retiree Life, Health, Medical and Surgical benefits remain unchanged during the term of the Contract." (Df.'s Mot.S.J.Ex. 8 at 5). In 1988, the settlement agreement contained the following language:

The Company will continue during the term of the new Contract the Group, Life, Health, Medical and Surgical benefits in the same amount and under the same amount and under the same provisions currently in effect and under the same terms and conditions outlined in the 1984 Settlement Agreement for employees, retirees, and eligible dependents. These benefits will continue unchanged during the term of the new Contract.

(Df.'s Mot.S.J.Ex. 9 at 2).

In addition to the CBA and settlement agreements entered into by the parties, the Company also distributed summary plan documents which pertained to the furnishing of retiree insurance benefits and summarized the contents of those benefits for the participants. Sometime in 1972, the Company issued a booklet entitled "Group Insurance Plan for the Retired Hourly Employees of Tecumseh Products Division" which contained the following caveat: "It is hoped that this plan will be continued indefinitely, but, as is customary in Group Insurance Plans, the right of change or discontinuance at any time must be reserved." (Df.'s Mot. S.J.Ex. 19). The company issued another booklet on March 1, 1975 for retired hour-

---

**2.** The changes put in effect after the negotiation of the 1984 CBA included "increased deductibles, pre-certification requirements, 80/20 co-pays, and penalties for failing to comply with pre-certification requirements." (Df.'s Mot.S.J. at 8, Stuffs Aff. at ¶ 11). On March 11, 1984, Tecumseh sent a letter to the retirees detailing all the changes that had been made to the health care coverage and included a question and answer booklet to explain the changes. (Df.'s Mot.S.J., Ex. 20).

ly employees which contained the aforementioned language.[3] In 1988, the summary plan document was entitled "Benefit Handbook for Retirees of Tecumseh Products Division" and contained the following clause:

> These benefits are negotiated under the basic labor agreement. The benefits, terms and conditions of the Plan are, therefore, subject to change through the collective bargaining process, wherein the Company reserves the right to amend, modify or discontinue any or all of the benefits described in this booklet at any time.

(Df.'s Mot.S.J.Ex. 23). At the conclusion of the 1988 summary plan description a section appears entitled "ERISA Rights" and contains the following limitation:

> It is the intention of the Company to continue the plans for active and retired employees indefinitely, although the Company reserves the right to modify or discontinue the Plan described herein at any time without the consent of or without giving notice to participants.

The final document pertinent to the present inquiry was issued by the company in 1988 and is entitled "Group Health Care Plan for United Products Workers Hourly Retirees,"[4] and provided the following limitation:

> 1.2 Term of Plan. The Plan shall be co-extensive with the collective bargaining agreement entered into between the UPW and the Division, which is effective as of May 15, 1988 and covers a three (3) year period ending May 15, 1991 (the "Labor Agreement"), unless the plan is earlier terminated as described in Articles V and VIII below.

(Df.'s Mot.S.J.Ex. 23 at 50). Article VIII of the group health care plan states:

8.1 *Amendments.* The Plan Sponsor reserves the absolute right, through the collective bargaining process, to amend, modify, or discontinue any or all of the benefits described in the Contract or the Plan, and any amendment shall be effective in the manner and at the time therein set forth. Notwithstanding the provisions of the Section 8.1, the Contract may be amended only in accordance with the provisions of such Contract. Additionally, no employee of the Division or the Company is authorized to modify or vary from the actual written provisions of the Contract or the Plan. Accordingly, any advice received by a Participant is subject to verification, and, if necessary, correction.

The CBA covering the period from 1988 to 1991 expired on May 15, 1991 and a strike ensued.

### *Standard of Review*

Rule 56(c) of the Federal Rules of Civil Procedure mandates the entry of summary judgment when "the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." There is no "genuine issue of material fact for trial unless, by viewing the evidence in favor of the nonmoving party, a reasonable jury could return a verdict for that party." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Boddy v. Dean,* 821 F.2d 346, 349 (6th Cir.1987). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505.

---

**3.** The company also issued summary plan descriptions containing similar language to that contained in the 1975 booklet in 1980, and again in February of 1986.

**4.** The Court is at a loss to construe the precise nature of this document. Neither party alludes to its significance except to state that it was issued in 1988. Defendants in their Reply Brief refer to the document as "The 1988 health care plan" and it contains essentially the same limitational clauses as appear in the other documents.

The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which establish the absence of a material issue of fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Potters Medical Center v. City Hospital Association,* 800 F.2d 568, 572 (6th Cir.1986). The substantive law identifies which facts are material. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. "The district court is not to make credibility determinations or weigh the evidence" upon a motion for summary judgment. *Adams v. Metiva,* 31 F.3d 375, 384 (6th Cir.1994) (citing *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505).

Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and come forward with specific facts to show that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 322–24, 106 S.Ct. 2548. The non-moving party must do more than show that there is some metaphysical doubt as to the material facts. *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 800 (6th Cir.1994) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538(1986)). It must present significant probative evidence in support of its opposition to the motion for summary judgment in order to defeat the motion for summary judgment. *Moore v. Philip Morris Companies,* 8 F.3d 335, 339–40 (6th Cir.1993). If, after adequate time for discovery, the party bearing the burden of proof fails to make a showing sufficient to establish an essential element of his claim, summary judgment is appropriate. *Celotex,* 477 U.S. at 322–24, 106 S.Ct. 2548.

### Plaintiff's Claim under § 301 of the LMRA

In Count I of the complaint, plaintiff asserts a claim pursuant to § 301 of the LMRA, 29 U.S.C. § 185(a), contending that defendants breached the terms of the CBAs entered into by the parties by failing to provide fully funded lifetime benefits to the class of retirees upon the expiration of the 1991 CBA. In addition, plaintiff also asserts a claim under § 502 of ERISA, 29 U.S.C. § 1132, alleging that certain summary plan documents contained ambiguous provisions which require extrinsic evidence for an interpretation from which the Court may then glean the intent to provide fully funded lifetime benefits to the retirees. Plaintiff, relying upon the Sixth Circuit's decision in *UAW v. Yard–Man,* 716 F.2d 1476 (6th Cir. 1983), argues that retirement benefits "normally" vest because "unions and companies are not required to negotiate on behalf of retired employees." In addition, plaintiff maintains that retirement benefits are "status benefits" which are intended to continue as long as the status of the "retiree" continues. Therefore, plaintiff contends that the "nonspecific durational clauses" upon which defendants rely cannot "outweigh the implication that the parties intended to provide retiree health care beyond the life of the contract." (Df.'s Mot.S.J. at 9). In contrast, defendants argue that the CBA and corresponding summary plan documents unambiguously expressed the intent of the parties that retiree welfare benefits did not vest and expired upon termination of the CBA.

Courts have held that "after a CBA expires, an employer generally is free to modify or terminate any retiree medical benefits that the employer provided pursuant to that CBA." *American Federation of Grain Millers v. Intern. Multifoods,* 116 F.3d 976, 979 (2nd Cir.1997). "The enforcement and interpretation of collective bargaining agreements is governed by traditional rules of contract interpretation as long as their application is not inconsistent with federal labor policy." *Armistead v. Vernitron,* 944 F.2d 1287, 1293 (6th Cir.1991) (citing *International Union, United Auto., Aerospace, and Agric. Implement Workers of America (UAW) v. Yard–Man, Inc.,* 716 F.2d 1476, 1479 (6th Cir.1983)).

When disputes arise, courts should first look to the explicit language of the agreement to determine, if possible, the clear intent of the parties. The intended meaning of even the most explicit language can, of course, only be understood in the light of the context that gave rise to its inclusion. If possible, each provision should be construed consistently with the entire document and the relative positions and purposes of the parties. As in all contracts, the terms of a collective bargaining agreement should be construed so as to render none nugatory and to avoid illusory promises. Where ambiguities exist, the court may look to other words and phrases in the collective bargaining agreement for guidance.

*Id.* (internal citations omitted). In the instant case, the language of the 1988 CBA contained the following limitation: "The company has established an Insurance Plan for employees covered by this Agreement and this Plan shall remain in effect for the duration of the Labor Agreement without costs to said employees." In addition to the aforementioned language contained in the CBA, the settlement agreement which set forth any operative changes in the 1988 CBA, also provided the following limitation,

The Company will continue during the term of the new Contract the Group, Life, Health, Medical and Surgical benefits in the same amount and under the same provisions currently in effect and under the same terms and conditions outlined in the 1984 Settlement Agreement for employees, retirees, and eligible dependents.

Finally, the 1988 health care plan booklet entitled "Group Health Care Plan for United Products Workers Hourly Retirees" contained the following clause governing the terms of the plan:

1.2 *Term of Plan. The Plan shall be coextensive with the Collective Bargaining Agreement entered into between the UPW and the Division, which is effec-tive as of May 15, 1988 and covers a three (3) year period ending May 15, 1991 (the "Labor Agreement"), unless the Plan is earlier terminated as described in Articles V and VIII, below.*

(Df.'s Rep.Ex. A) (emphasis in original). Article VIII of the group health care plan states:

8.1 *Amendments.* The Plan Sponsor reserves the absolute right, through the collective bargaining process, to amend, modify, or discontinue any or all of the benefits described in the Contract or the Plan, and any amendment shall be effective in the manner and at the time therein set forth. Notwithstanding the provisions of the Section 8.1, the Contract may be amended only in accordance with the provisions of such Contract. Additionally, no employee of the Division or the Company is authorized to modify or vary from the actual written provisions of the Contract or the Plan. Accordingly, any advice received by a Participant is subject to verification, and, if necessary, correction.

Taken together, these clauses provide the relevant limitations to the 1988 CBA at issue upon which defendants rely to assert that the benefits about which plaintiff complains were not vested benefits.

Plaintiff principally relies upon the Sixth Circuit's decision in *Yard–Man, supra,* which indicated that "retiree benefits are in a sense 'status benefits which, as such, carry with them an inference that they continue so long as the prerequisite status is maintained.'" *Yard–Man,* 716 F.2d at 1482 (citation omitted). According to plaintiff, the intent of the parties to the CBA was to provide for vested lifetime retiree benefits, and this intent must be "gleaned from an examination of all the circumstances, documents, and testimony." (Pl.'s Resp. at 11). At the June 19, 1998 hearing on defendants' motion for summary judgment, plaintiff heavily relied upon the Sixth Circuit's decision in *Armistead v. Vernitron Corp.,* 944 F.2d 1287 (6th Cir.1991) wherein the Sixth Circuit

gleaned the intent to provide lifetime benefits to retirees from a CBA and the course of dealing between the parties.[5] Conversely, defendants rely upon the Second Circuit's decision in *American Federation of Grain Millers, AFL—CIO v. International Multifoods Corp.*, 116 F.3d 976, 981 (2nd Cir.1997) and the district court's decision in *International Union, UAW v. Cleveland Gear Corp.*, No. C83–947, 1983 WL 2174 (N.D.Ohio 1983) for its proposition that unambiguous plan documents which manifest an intent to provide benefits for the duration of the labor contract bar plaintiff's claims.

In order to adjudicate the merits of plaintiff's claim, the Court will return to the principles espoused by the Sixth Circuit in *Yard–Man* and its progeny. In *Yard–Man*, the Court began by recognizing that "the parties may ... provide retiree insurance benefits which survive the expiration of the collective bargaining agreement," but cautioned that "[a]ny such surviving benefit must necessarily find its genesis in the collective bargaining agreement." *Yard–Man*, 716 F.2d at 1479. In order to began its analysis, a court must "first look to the explicit language of the collective bargaining agreement for clear manifestations of intent." *Id.* at 1479.

Article XXIV of the 1988 CBA contained the following clause, "The Company has established an Insurance Plan for employees covered by this Agreement, and this Plan shall remain in effect for the duration of the Labor Agreement without a premium cost to said employees." (Df.'s Mot.S.J.Ex. 14). The clauses contained in the "Group Health Care Plan for United Products Workers Hourly Retirees" similarly limits the duration of the plan to the collective bargaining agreement, unless termination occurs at an earlier date through the events contained in Articles V or VIII. The modification and/or termination clauses contained in Article VIII reserve to the plan sponsor the right, through the collective bargaining process, to "amend, modify, or discontinue any or all of the benefits described in the Contract or the Plan...." Collectively, defendants argue that these clauses unambiguously limit the company's obligation to provide insurance for the retirees to the duration of the Labor Agreement.

In support of its position, defendant cites the Second Circuit's opinion in *American Federation, supra*. In *American Federation*, the Second Circuit confronted plaintiffs' challenge to an employer's modification of its retiree insurance program contending that retirement benefits conferred under a CBA were vested lifetime benefits. The operative language of the CBA at issue provided, "An amended schedule of [medical] insurance coverage for all regular Employees covered by this Agreement has been established, which is to be provided without Employee or retiree contributions. During the term of this agreement there shall be no reduction in the schedule of benefits." 116 F.3d at 981. The Second Circuit, in finding plaintiffs' claims under the LMRA and ERISA unavailing, noted that each CBA expressly tied the provision of benefits to the duration of the CBA, and concluded "[p]romising to provide benefits for a certain period of time necessarily establishes that once that time period expires, the promise does as well." *Id.* at 981 (citing *In re Chateaugay*, 945 F.2d 1205, 1208 (2nd Cir.1991))

5. Although *Armistead* may have some relevance to the issues in the instant case, there are significant distinctions between the CBA at issue in *Armistead* and that with which the Court is presently faced. Significantly, the CBA in *Armistead*, did not contain any language which limited the company's obligation to provide benefits to the duration of the CBA. Second, the reservation of rights clause which stated "Alladdin Industries, Inc. expects to continue the plan indefinitely, but the company must reserve the right to amend or terminate it, or to change the method of providing benefits" was omitted from subsequent summary plan documents and the company was barred from relying upon it to defend against the plaintiffs' claims.

In addition, defendants cite the district court's opinion in *Cleveland Gear* wherein the court examined a CBA containing the following clause "The Insurance Agreement and Insurance Plan, as revised, shall be effective as provided therein and shall remain in full force and effect during the term of this collective bargaining agreement." *International Union v. Cleveland Gear,* No. C83–947, 1983 WL 2174, *2 (N.D.Ohio Oct.20, 1983) (copy attached). In determining that the clause did not manifest an intention to create benefits that survive the termination of the collective bargaining agreement, the court stated,

> [t]his language clearly demonstrates the intent of the parties to restrict to the term of the Master Contract the specific insurance benefits contained in the Insurance Agreement and Insurance Plan. However unfortunate that language seems now to the recipients of insurance benefits, it is clear that the parties hereto must have intended at the time of formulating the collective bargaining agreement for the insurance benefits to run only during the term of the Master Contract for both current and retired employees.

*Id.*

Plaintiff does not identify any express language contained in the CBAs which indicates defendants' intent to provide lifetime benefits to its retirees. Rather, on the issue of the express language of the CBA, plaintiff argues that the CBA is ambiguous because it is "silent regarding the benefits for retirees." According to plaintiff, from the inception of the 1965 CBA, the term "employees" as used in the CBA refers only to active employees, and not to retired employees. Therefore, any durational clauses contained in the CBA refer only to those "active" employees of defendants.

■ Second, plaintiff asserts that "[i]n the collective bargaining context, however, there is an inherent conflict between "plan" documents that reserve the unlimit-

ed right to the employer to terminate benefits, and that employer's obligation to terminate benefits only by collective bargaining." (Pl.'s Resp. at 14). The essence of plaintiff's argument centers upon those clauses contained in the 1988 summary plan description which on the one hand state that the right to modify, amend, or terminate the terms of the insurance plan shall be accomplished exclusively through collective bargaining and that clause contained in the "ERISA Rights" section which reserves to the employer the unilateral right to modify, amend, or terminate the plan without notice to or the prior consent of the participants. According to plaintiff, these provisions conflict with one another and create ambiguity as to the employer's modification and/or termination rights. To resolve this ambiguity plaintiff directs the Court to extrinsic evidence from which plaintiff believes that the Court will be able to glean the intent to provide fully funded lifetime benefits to the retirees.

In reply to plaintiff's ambiguity assertion about the scope of the coverage of the CBA, defendants respond that the 1965 CBA expressly covers both active and retired employees by incorporating a reference to the insurance booklet which covers both active and retired employees. Second, defendants point to the 1968, 1975, 1981, 1984, and 1988 settlement agreements, all of which contain an explicit reference to insurance benefits for "retired employees" and link defendants' obligation to provide benefits to the retirees to the duration of the agreement.

In this Court's opinion, the relevant clause in the CBA expressly limits the provision of retiree benefits to the duration of the labor agreement. Article XXIV of the CBA expressly states "this Plan shall remain in effect for the duration of the Labor Agreement...." Clearly, the language utilized by the parties is unambiguous in its import. The promise to provide retirement benefits is expressly linked to the duration of the labor agreement. Sec-

ond, the settlement agreement, a mechanism by which changes were set forth in the CBA, disseminated commensurate with the 1988 CBA contained the following clause:

> The Company will continue during the term of the new contract the Group Life, Health, Medical and Surgical benefits in the same amount and under the same provisions currently in effect and under the same terms and conditions as outlined in the 1984 settlement Agreement for employees, retirees and eligible dependents. These benefits will continue unchanged during the term of the new contract.

Finally, the document entitled "Group Health Care Plan for United Products Workers Hourly Retirees" contained the following limitation,

> 1.2 Term of Plan. The Plan shall be coextensive with the Collective Bargaining Agreement entered into between the UPW and the Division, which is effective as of May 15, 1988 and covers a three (3) year period ending May 15, 1991 (the "Labor Agreement"), unless the Plan is earlier terminated as described in Articles V and VIII, below.

The aforementioned clauses all unequivocally set forth the Company's intention to link its obligation to provide benefits to the retirees to the duration of the CBA. The company's obligation to provide retirement benefits ended upon the expiration of the 1988–1991 CBA. Following its termination, representatives of defendants and the union began the collective bargaining process, the outcome of which resulted in the termination of the retirees' benefits. The Court believes that such a result, while unfortunate for the retirees, is sanctioned by the language of the CBA. In this Court's opinion, the clauses upon which defendants rely, are sufficient to unambiguously express defendants' intent that the duration of defendants' obligation to pro-

vide fully funded benefits is coextensive with the CBA.

Moreover, the Court believes that plaintiff has failed to articulate how the aforementioned language, or any language contained in the CBA, settlement agreement, or insurance document confers fully funded lifetime benefits upon the retirees. In cases upon which plaintiff relies where the Court has determined that retirees are provided with lifetime benefits, the language utilized is in stark contrast to that under consideration in the instant case.

In a recent decision of this Court, *Golden v. Kelsey–Hayes Co.*, 954 F.Supp. 1173 (E.D.Mich.1997), the language of the insurance plan at issue stated "The Health Care ... Coverage ... an employee has under this Article at the time of retirement ... shall be continued thereafter...." In addition, the CBA at issue in *Golden* included the following clause, "The Company shall contribute the full premium or subscription charge for health care ... coverage ... for ... a retired employee and his eligible dependents provided such retired employee is eligible for benefits under Article II of the ... Pension Plan." The court, in determining that these provisions conferred lifetime benefits upon the retirees, stated "[T]he language in the agreements directly tie retiree eligibility for health care coverage to pension entitlement and therefore is a clear indicia that Kelsey–Hayes intended to provide lifetime health care coverage." 954 F.Supp. at 1187.[6] Further, in *Policy v. Powell Pressed Steel Co.*, 770 F.2d 609, 611 (6th Cir.1985), the applicable language stated "Despite anything to the contrary herein contained, present pensioners ... will ... receive ... medicare complementary coverage on their hospitalization and surgical benefits for the pensioner and his spouse, if any, during the life of the pensioner at no cost to the pensioner." The Court in *Policy* determined that the aforementioned

---

**6.** The Court in *Kelsey–Hayes* specifically noted that the defendants did not set forth any evidence tending to show that the "Insurance

Supplements or the CBA contained valid reservation of rights language." 954 F.Supp. at 1185.

language conferred lifetime benefits upon the pensioners. Both of the agreements at issue in the cases upon which plaintiff relies, expressly link the provision of benefits to pension benefits and include language specifically directed to the duration of the company's obligation to provide benefits.

Finally, assuming *arguendo,* that plaintiff is correct in asserting an ambiguity exists in "plan documents" which reserve to the employer an unfettered right to terminate benefits, but also provide that the employer's termination right can only be exercised through the collective bargaining process, the Court does not believe that resolving that perceived ambiguity will entitle plaintiff to anything less than that which he bargained for and received in the 1988–1991 CBA. Under *Yard–Man, supra,* any benefit which survives the termination of the CBA, "must find its genesis in the collective bargaining agreement;" accordingly, plaintiff must pass the insurmountable hurdle of uncovering a promise in the 1988–1991 CBA to provide a benefit which survives the termination of that agreement. To hold otherwise would afford plaintiff a benefit not contemplated by the terms of the CBA. The 1988–1991 CBA and corresponding settlement agreement expressly limit the Company's obligation to provide benefits to the duration of the CBA. Entertaining extrinsic evidence to resolve any perceived ambiguity in plan documents will not alter the nature of the employer's original obligation which it fulfilled upon the expiration of the 1988–1991 CBA.

The documents at issue in the instant case do not unambiguously manifest an intent to confer fully funded lifetime benefits. Instead, the CBA, settlement agreement, and insurance plan effectively limit the provision of benefits to the duration of the CBA. Accordingly, the Court does not find merit in plaintiff's claim under § 301 of the LMRA.

*Plaintiff's Claim under § 502 of ERISA*

█ Under ERISA, two distinct types of employee benefit plans—pension plans

and welfare plans—are contemplated. *See* 29 U.S.C. § 1002(1). As the plan at issue in the instant case involves the provision of medical benefits, it is a welfare plan. *See id.* § 1002(1). In contrast to employee pension plans, employee welfare plans generally are not vested and an employer can amend or terminate a welfare plan at any time. *Inter–Modal Rail Employees Ass'n v. Atchison, Topeka & Santa Fe Ry. Co.,* 520 U.S. 510, 117 S.Ct. 1513, 1516, 137 L.Ed.2d 763 (1997); *see also Curtiss–Wright Corp. v. Schoonejongen,* 514 U.S. 73, 78, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995) ("ERISA does not create any substantive entitlement to employer-provided health benefits or any other kind of welfare benefits. Employers ... are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans.") Defendants rely upon the Sixth Circuit's recent decision in *Sprague v. General Motors,* 133 F.3d 388 (6th Cir.), *cert. denied,* 524 U.S. 923, 118 S.Ct. 2312, 141 L.Ed.2d 170, 66 U.S.L.W. 3779 (June 8, 1998), for the proposition that an express reservation of the right to modify or terminate insurance benefits is sufficient to defeat plaintiff's claim for an ERISA violation.

Plaintiff's claim under ERISA is predicated upon summary plan documents issued by defendants detailing the insurance benefits to which its retirees were entitled. The essence of plaintiff's ERISA claim is similar to that stated by plaintiff under the LMRA in that plaintiff contends that where the summary plan documents are ambiguous the Court should entertain extrinsic evidence to define the intent of the parties. Plaintiff attempts to distinguish *Sprague* on the basis that the benefits at issue in that case were not collectively bargained for benefits. According to plaintiff, the reservation language which reserves the unilateral right to termination conflicts with the employer's "obligation" to terminate those benefits through the collective bargaining process.

In 1988, the defendants published a document entitled "Group Health Care Plan for United Products Workers Hourly Retirees" which contained the following reservation,

> It is the intention of the Company to continue plans for active and retired employees indefinitely, although the Company reserves the right to modify or discontinue the plan described herein without the consent of or without giving notice to participants.

According to defendants, the inclusion of this reservation is sufficient to enable defendants to change, modify, or discontinue in their entirety retirement benefits to plaintiff. In *Sprague*, the plaintiffs brought suit over GM's decision to modify the terms of its insurance program to retirees. According to plaintiffs, GM's decision to modify its insurance program breached the express terms of the plan documents which provided that health coverage would be provided, "at no cost to" them and "for [their] lifetimes." However, the summary plan descriptions at issue in *Sprague* also contained two separate clauses both of which reserved to the company "the right to amend, change or terminate the Plans and Programs described in this booklet." In determining that the reservation of rights clause effectively barred plaintiffs' claims, the court stated,

> We see no ambiguity in a summary plan description that tells participants both that the terms of the current plan entitle them to health insurance at no cost throughout retirement and that the

terms of the current plan are subject to change.

*Sprague*, 133 F.3d at 401.

The Court believes that the resolution of the instant case is controlled by the Court's holding in *Sprague*. The benefits about which plaintiff complains were conferred pursuant to the 1988–1991 CBA, the terms of which expired on May 15, 1991. The applicable language of defendants' group insurance program expressly reserved to defendants the right to modify or discontinue the existing plan for retirees.[7] Accordingly, under the Sixth Circuit's holding in *Sprague*, the Court does not believe that plaintiff's claims for a violation of § 502 of ERISA are meritorious.

### Breach of Fiduciary Duty

■ Count III of plaintiff's complaint is premised upon an alleged breach of fiduciary duty under ERISA. In plaintiff's response in opposition to defendants' motion for summary judgment, plaintiff states that the breach of fiduciary duty claim is predicated upon defendants "unilateral[ ] terminat[ion][of] the fully-funded retiree health and life insurance program." (Pl.'s Resp. at 16). According to plaintiff, an employer acts as a fiduciary under ERISA when it "interpret[s] the plan, when following or failing to follow procedures prescribed by the plan, and when amending a plan to terminate contractually vested rights."*Id.* The substance of plaintiff's claim, while somewhat nebulous at first blush, appears to be founded solely on

---

7. The Court does not reach the issue of whether a contractual ambiguity with respect to termination exists where the employer in one clause promises to modify, amend or terminate exclusively through collective bargaining, and in a separate section reserves the unilateral right to terminate benefits. As previously discussed, the Company promised to provide plaintiff with fully funded benefits for the duration of the CBA. Upon its expiration, the Company fulfilled its promise and plaintiff cannot claim entitlement to a benefit which was not previously conferred in a CBA. However the Court notes that when confronted with a similar challenge, the Second Circuit left open the question of how a "document should be interpreted when it includes a general statement that all the benefits provided under the plan could be amended or terminated but also includes specific terms which could reasonably be interpreted as promising vested retiree benefits." *American Federation*, 116 F.3d 976, 983 (2nd Cir.1997). It would seem that question was answered by the Sixth Circuit in *Sprague, supra*, when it ascertained that although the parties were promised lifetime benefits, they were also on notice that those terms were subject to change.

defendants' decision to terminate the benefits to the retirees.

The Sixth Circuit, in *Musto v. American General*, 861 F.2d 897, 906 (6th Cir.1988) confronted a breach of fiduciary duty claim in the context of a defendant's decision to terminate retiree benefits pursuant to a clause which maintained the reservation of the right to modify, amend, or cancel the insurance program. In determining that the company did not act in a fiduciary capacity, the court stated "The case law ... makes it clear that when an employer decides to establish, amend, or terminate a benefits plan, as opposed to managing any assets of the plan and administering the plan in accordance with its terms, its actions are not to be judged by fiduciary standards." *Id.* at 912. More recently, the Sixth Circuit in *Sprague* rejected the retirees' breach of fiduciary duty claim founded upon GM's decision to modify its insurance benefits plan. The court succinctly stated, "GM did not act as a fiduciary in deciding to change its health insurance policies." *Sprague*, 133 F.3d at 404 (citing *Lockheed v. Spink*, 517 U.S. 882, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996)). Accordingly, the Court finds that plaintiff's breach of fiduciary duty claim is without merit.

### Plaintiff's Estoppel Claims

In Counts II and V of plaintiff's complaint, plaintiff appears to assert estoppel claims and a claim of misrepresentation. However, in the perplexing mire of plaintiff's response brief, plaintiff interchangeably talks about claims of promissory estoppel, equitable estoppel, breach of fiduciary duty, and misrepresentation. To the extent that Counts II and V of plaintiff's complaint are based upon estoppel and misrepresentation, the Court will address the merits of these claims.

In *Armistead v. Vernitron Corp.*, 944 F.2d 1287 (6th Cir.1991) the Sixth Circuit first recognized the viability of an equitable estoppel claim in the context of ERISA, the elements of which are as follows:

1) conduct or language amounting to a representation of material fact; 2) awareness of the true facts by the party to be estopped; 3) an intention on the part of the party to be estopped that the representation be acted on, or conduct toward the party asserting the estoppel such that the latter has a right to believe that the former's conduct is so intended; 4) unawareness of the true facts by the party asserting the estoppel; and 5) detrimental and justifiable reliance by the party asserting estoppel on the representation.

*Id.* at 1298. Relying in part on *Armistead*, plaintiff contends that defendants should be equitably estopped from denying lifetime retirement benefits to plaintiff based on various representations by officials of defendants to the effect that plaintiff would continue to receive insurance benefits throughout his lifetime.[8] According to plaintiff, Bittinger and several other retirees were informed by Joe Fortunato, defendants' director of employee benefits, at retirement exit interviews that each retiree would have fully funded lifetime health coverage and life insurance. In addition, at the exit interview, each retiree was provided with a retiree information sheet, which plaintiff Bittinger contends reiterates Fortunato's alleged promise that each retiree would be provided fully funded lifetime health and life insurance. Collectively, plaintiff argues that the aforementioned statements and conduct on the

---

8. To the extent that plaintiff Bittinger brings this estoppel claim, the Court notes that he also relies upon statements made by his workers' compensation attorney to the effect that his pension and insurance benefits would continue throughout the duration of his retirement. However, as the Court believes that the Sixth Circuit's pronouncement in *Sprague*, *supra* is dispositive of plaintiffs' claims, the Court will not address the remainder of Bittinger's argument.

part of defendants amount to a representation and/or promise sufficient to support a claim of equitable estoppel and promissory estoppel. Defendants' reply to plaintiff's estoppel claim is two-fold. Initially, defendants contend that the Sixth Circuit has not made any pronouncement on the viability of a promissory estoppel claim in the context of ERISA. Second, relying in part on the Sixth Circuit's recent decision in *Sprague*, defendants maintain that even if Fortunato made such a representation, it cannot be utilized to vary the terms of an unambiguous plan document reserving the right to amend or modify the insurance plan.

The Court believes that the principles handed down in *Sprague* control the resolution of the instant case. Before addressing the merits of the plaintiffs' estoppel claim in *Sprague*, the Court in a footnote stated, "Although we have never explicitly held that promissory estoppel claims are cognizable under ERISA, we see no reason to treat the two forms of estoppel differently." 133 F.3d at 403–404, fn. 13. Given the foregoing declaration from the Sixth Circuit, and because the Court believes that a claim for promissory estoppel, as well as invocation of the doctrine of equitable estoppel, require justifiable reliance, the Court will treat plaintiff's claims for promissory estoppel and/or equitable estoppel in the same context.

In *Sprague*, the Sixth Circuit succinctly stated, "Principles of estoppel, however, cannot be applied to vary the terms of unambiguous plan documents; estoppel can only be invoked in the context of ambiguous plan provisions." 133 F.3d at 404. In the instant case, as in the welfare benefit plan at issue in *Sprague*, the plan documents unambiguously reserved the right to the defendant to modify, change, or terminate the insurance plan. The Court in

*Sprague* continued by underscoring the fundamental tenets of its reasoning in denying the availability of an estoppel claim in this context,

> [E]stoppel requires reasonable or justifiable reliance by the party asserting the estoppel. That party's reliance can seldom, if ever, be reasonable or justifiable if it is inconsistent with the clear and unambiguous terms of plan documents available to or furnished to the party. Second, to allow estoppel to override the clear terms of plan documents would be to enforce something other than the plan documents themselves. That would not be consistent with ERISA.

133 F.3d at 404. In the instant case, copies of defendants' summary plan documents containing the reservation language were either "available to or furnished to" plaintiff Bittinger and the rest of the members of the class. Assuming, *arguendo*, that Fortunato did make the representations concerning lifetime benefits of which plaintiff maintains, these representations are clearly inconsistent with the written terms of the plan which expressly reserve the right of modification to the employer.[9]

Moreover, with respect to the reliance issue, the Court does not believe that plaintiff and the other members of the class can establish reasonable reliance. It is undisputed that plaintiff Bittinger did not retire in reliance on any promise made by defendants or their employees. Rather, Bittinger alleges that he redeemed his worker's compensation claim in reliance upon defendants' representations of fully funded health insurance. Defendants point out that plaintiff should have been aware that the benefits he seeks were not vested benefits because the Company negotiated significant changes in retiree health care as early as 1984. In either

---

9. Not only does the Court believe that the plan documents were unambiguous with respect to the right of the employer to modify and/or change the provision of benefits, but the Court also believes that under *Sprague*, *supra* defendant is entitled to rely upon the unambiguous language contained in its CBA and settlement agreement. As previously discussed, the Court believes that these documents unambiguously limit the duration of the provision of benefits to the expiration of the CBA.

case, the Court believes that plaintiff's cannot overcome *Sprague's* controlling limitation. Under *Sprague,* plaintiff Bittinger and the other members of the class cannot be said to have justifiably relied upon oral representations in the face of unambiguous plan documents. Accordingly, the Court concludes that plaintiff Bittinger's estoppel claim must fail.

### Misrepresentation

In Count V of plaintiff's complaint, plaintiff states a claim for fraud and misrepresentation. In addressing this aspect of the complaint, defendants contends that plaintiff's claims are preempted by ERISA. Plaintiff makes no tenable reply to this argument nor discernible attempt in his brief in response to defendants' motion for summary judgment to distinguish between plaintiff's claims of misrepresentation, fraud, promissory and/or equitable estoppel. Assuming for purposes of this motion that plaintiff's complaint sets forth a colorable claim of misrepresentation and/or fraud based upon defendants' employee Fortunato's alleged representations to plaintiff Bittinger, the Court believes that these claims fall within the purview of ERISA's preemption exclusion.

Under section 514(a) of ERISA, "the provisions of this Title and Title IV shall supersede any and all state laws in so far as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). "The phrase 'relate to' is given broad meaning such that a state law cause of action is preempted if 'it has connection with or reference to that plan.'" *Cromwell v. Equicor-Equitable HCA Corp.,* 944 F.2d 1272, 1275 (6th Cir.1991) (quoting *Metropolitan Life Ins. Co. v. Commonwealth of Massachusetts,* 471 U.S. 724, 730, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985)). Nevertheless, some "state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan." *Shaw v. Delta Air Lines, Inc.* 463 U.S. 85, 100, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983).

However, "[i]t is not the label placed on a state law claim that determines whether it is preempted, but whether in essence such a claim is for the recovery of an ERISA plan benefit." *Cromwell,* 944 F.2d at 1276 (citing *Scott v. Gulf Oil Corp.* 754 F.2d 1499 (9th Cir.1985)).

■ In determining whether a state law cause of action "relates to" an ERISA plan, courts consider the follow factors: 1) "whether the state law represents a traditional exercise of state authority;" 2) whether application of the state law would affect relations among "principle ERISA entities—the employer, the plan, the plan fiduciaries, and the beneficiaries;" and 3) "the incidental nature of any possible effect of the state law on an ERISA plan." *Firestone Tire & Rubber Co. v. Neusser,* 810 F.2d 550, 555–56 (6th Cir.1987).

■ Application of the first factor is not dispositive. There is no dispute that state tort laws are a traditional exercise of state authority, and misrepresentation is a distinct species of tort law. However, it is commonplace for federal courts to hold that state contract and tort suits are preempted by ERISA. *See Cromwell,* 944 F.2d at 1276; *see also Firestone,* 810 F.2d at 556 (holding that the first factor was not dispositive where the type of state law in question, i.e. a tax law, had been ruled preempted by the Supreme Court).

On the other hand, the resolution of the second factor weighs heavily in favor of preemption. This suit is directly at the heart of relations among "principle ERISA entities." Plaintiff, and the other retirees, are members of a class of retirees under a welfare plan the administration of which is governed by ERISA, and are beneficiaries of the health and life insurance benefits contemplated by the plan at issue. Second, defendant Tecumseh is the employer and administrator of the welfare benefit plan at issue. The essence of plaintiff's misrepresentation claim is that Fortunato communicated that the retirees were entitled to lifetime health and welfare benefits

upon their retirement. Plaintiff seeks a declaration from this Court entitling plaintiff, and the other members of the class, to the lifetime health and welfare benefits. The outcome of this litigation will clearly affect the relationship between the employer, the plan, and the beneficiaries. In *Cromwell,* the appellant provided health care services to a plan beneficiary, who had ceased working for his employer and was no longer entitled to benefits. After the plan administrator declined to pay the appellant for these services, the appellant filed an action for breach of contract, promissory estoppel, negligence and breach of good faith, based on the plan administrator's failure to inform it that the beneficiary was no longer entitled to benefits due to his termination. The Sixth Circuit ruled that "appellant's state law claims are at the very heart of issues within the scope of ERISA's exclusive regulation and, if allowed, would affect the relationship between plan principals by extending coverage beyond the terms of the plan. Clearly, appellant's claims are preempted by ERISA." 944 F.2d at 1276.

Similarly, the Court believes that plaintiff's misrepresentation claim, if allowed, would clearly affect the relationship between plan principals by extending fully funded lifetime health and life insurance benefits coverage not contemplated by the terms of the plan. In addition, the remedy which plaintiff seeks, is clearly the conferral of a benefit of the plan—lifetime health and life insurance benefits, and under *Cromwell* such an action is preempted. Accordingly, the Court concludes that plaintiff's misrepresentation claim is preempted by ERISA.

*Defendants' Motion for Summary Judgment as to Count I and III on Time Bar Grounds* [10]

▆▆▆ Defendants, in a subsequent filing, also seek entry of summary judgment as to Counts I and III on the grounds that plaintiff's claims are barred by the applicable statute of limitations. In Counts I and III of the complaint, plaintiff argues that defendants' termination of fully funded health and life insurance benefits to retirees violates the CBA entered into between the parties because such agreements provide for vested fully funded lifetime benefits to the retirees. This decision by defendants is the underlying basis for plaintiff's claims under § 301 of the LMRA, § 502 of ERISA, and for breach of fiduciary duty.

In its separate motion filed with respect to these counts, defendants allege that plaintiff knew about the facts giving rise to the claims asserted in Counts I and III as early as May 1984, at which time the UPW and Tecumseh engaged in mid-contract concessionary bargaining. In May 1984, the parties negotiated changes to the retiree insurance benefits to reduce costs which included a new 20 percent co-pay, new deductibles, and limitations on coverage. On May 11, 1984, after the negotiations were formalized, the company sent a letter to the retirees detailing the changes and enclosed a copy of an explanatory booklet about the changes.

According to defendants, if the essence of plaintiff's claim is that he is entitled to vested lifetime benefits pursuant to the CBA, the actions of the company in 1984 which made changes in the retirees' insurance program should have effectively placed the plaintiff on notice that he was not entitled to vested lifetime benefits. With respect to the "vesting" of the retirement benefits, defendants rely upon language in *Sprague, supra,* which states that "To vest benefits is to render them forever unalterable." *Sprague,* 133 F.3d at 400. Thus, defendants maintain that they "al-

---

**10.** As this Court has concluded, for the reasons heretofore set forth, that defendants are entitled to summary judgment on all claims, it is not necessary to review the other grounds for dismissal asserted by defendants. However-

er, in the event of appellate review, the Court believes there may be some value in addressing all of the issues raised in defendants' remaining motions for summary judgment.

tered" the status of plaintiff's reception of benefits by adding co-pays, deductibles, and limitations on coverage which in turn should have indicated to plaintiff that his rights in the health and life insurance benefits were not "vested" as that term was defined by the *Sprague* Court.

In contrast, plaintiff asserts that his cause of action did not accrue until 1991 "when ... fully funded insurance was terminated, then partially reinstated." (Pl.'s Resp. at 2). According to plaintiff, this Court certified the class action on the grounds that defendants "acted or refused to act in grounds generally applicable to the class in that prior to May 15, 1991, all members of the class were receiving fully-paid insurance, but not thereafter." *Id.* at 3. Accordingly, plaintiff contends that the statute did not commence running until May 15, 1991.

It is undisputed among the parties that as the LMRA does not provide a statute of limitations applicable to this action, the Court must apply the single most analogous statute of limitations of the forum state to the nature of the cause of action.[11] *See Central States S.E. and S.W. Areas Pension Fund v. Kraftco, Inc.,* 799 F.2d 1098, 1104–05 (6th Cir.1986) ("By adopting the statue governing an analogous cause of action under state law, federal law incorporates the States's judgment on the proper balance between the policies of repose and substantive policies of enforcement embodied in the state law cause of action.") According to the parties, the essence of a § 301 claim under the LMRA is for breach of contract; therefore, Michigan's six year limitations period for contracts provides the appropriate statute of limitation. *See* M.C.L. § 600.5807.

As the parties agree that the six-year statute of limitations found in M.C.L. § 600.5807 applies with respect to Count I, the Court must now determine whether

plaintiff's claims were timely filed. According to defendants, plaintiff's claims accrued on May 15, 1984, the date on which the company notified the plaintiff of the changes instituted in his retirement benefits. Conversely, plaintiff asserts that his cause of action accrued in May 1991, the date on which the CBA under which plaintiff previously received benefits expired and subsequently was not renewed.

In this Court's opinion, plaintiff's claims under the LMRA and ERISA were timely filed. Plaintiff seeks a declaration from this Court that pursuant to the CBA, plaintiff was entitled to fully paid lifetime benefits under the health and life insurance policies. After the non-renewal of the 1988–1991 CBA, plaintiff's benefits were terminated and then ultimately restored with the restriction that plaintiff was required to contribute a portion of the cost of the premium. The essence of plaintiff's claim is that he is entitled to fully paid retirement benefits. Although the mid-contract concessionary bargaining changed the nature of the benefits to which plaintiff was entitled under the plan, i.e. co-pays, deductibles, it did not alter the "status" of the benefits in that the employer continued to pay the entire premium for those benefits. Thus, plaintiff could not have been on notice that he may not be entitled to employer fully paid premiums on his insurance benefits until May 15, 1991, the date on which the Company informed the affected retirees of its intention to terminate the benefits. Accordingly, the Court believes that plaintiff's claims were timely filed as his cause of action did not accrue until May 15, 1991.

■ In the same motion, defendants also contend that the statute of limitations has run on plaintiff's breach of fiduciary duty claim. ERISA provides a statute of limitations under 29 U.S.C. § 1113, which states in pertinent part:

---

11. The Court notes that the parties also agree that plaintiffs' § 502 claim under ERISA is also governed by the six-year statue of limitations applicable to plaintiff's claim under the LMRA. Accordingly, the Court will treat both of the statute of limitations issues with respect to plaintiff's claim under the LMRA and ERISA in the same discussion.

No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of—

(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or

(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation; except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

Thus, under this section, plaintiff had three years from the date of the actual knowledge of defendants' alleged breach of fiduciary duty in which to commence his action. Defendants reiterate their argument that plaintiff's claim for breach of fiduciary duty accrued on May 15, 1984. However, for the reasons previously discussed, the Court believes that plaintiff's claims accrued on May 15, 1991. Accordingly, absent any applicable tolling provision, the statute of limitations on plaintiff's claim for breach of fiduciary duty ran on May 15, 1994.

The complaint initiating the present action was filed on June 10, 1994. It would appear that plaintiff's claim for breach of fiduciary duty must be dismissed as filed outside the applicable statute of limitations. However, plaintiff argues that the statute of limitations should be tolled during the pendency of *Spaulding, et. al. v. Tecumseh Products Co.* originally filed in this Court on November 13, 1991. The *Spaulding* complaint was initiated by three retirees who filed suit against defendants Tecumseh and the Union premised upon the decision to terminate fully funded benefits to the retirees. This Court dismissed this action on January 22, 1993 for failure to state a claim upon which relief could be granted, in the absence of affording plaintiffs class certification.

According to plaintiff, the pendency of the *Spaulding* action tolls the running of statute of limitations on plaintiff's breach of fiduciary duty claims. Plaintiff relies on the Supreme Court's decision in *Crown Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983), in which the Court held,

[T]he commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action. Once the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied.

*Id.* at 2397–98 (citations omitted). Under the Supreme Court's holding in *Parker*, plaintiff's claims are tolled until class certification is denied. In the instant case, this Court denied class certification in the *Spaulding* matter on January 22, 1993. As approximately six months of plaintiff's three year statute of limitation had already expired prior to the filing of the *Spaulding* action, plaintiff had approximately thirty months remaining following this Court's January 22, 1993 dismissal in which to file his claim. The present matter was filed on June 10, 1994. Accordingly, this Court finds that plaintiff's claims for breach of fiduciary duty were timely filed, and denies defendants' motion for summary judgment on time bar grounds.

*Defendants' Motion for Summary Judgment as to those Plaintiffs Who Signed Releases or Who are Deceased*

In their fourth dispositive motion filed with the Court, defendants seek summary judgment against plaintiff Bittinger and those members of the class who signed releases or who are presently deceased. In June of 1991, defendant Tecumseh sent a letter to the retirees informing them that it would no longer provide fully funded health and life insurance. The company

offered the retirees the opportunity to participate in a new plan under which the employer agreed to pay approximately 75% of the premium. As a condition to enrollment in the new plan, the retirees were required to execute a release which constituted acceptance of the new terms of the program and contained the following language: "in lieu of and in full and final settlement of any and all claimed obligations, if any, of the Company and/or the Tecumseh Division to provide retiree insurance benefits to you and/or your dependents." The releases further stated that "[y]our acceptance will be binding upon you, your beneficiaries and dependents, and any other party acting on your behalf."

The June 19, 1991 letter provided that plaintiff and other members of the class had approximately one month to determine whether or not they would accept the terms of the new insurance program. On June 30, 1991, plaintiff and other members of the UTPHR,[12] held a mass meeting the subject of which concerned the Company's offer of new benefits to its employees. At the meeting, two attorneys met with the retirees present and explained the import and potential ramifications of the releases. Plaintiff Bittinger accepted the Company's offer of new retiree benefit insurance and signed the letter agreement. In addition, approximately 777 class members also accepted the agreement. Since July 1, 1991, plaintiff and the other members of the class who signed the releases have been receiving medical insurance coverage with approximately 75% of the premium paid by the Company.

Defendants argue that the language of the release is binding upon plaintiff and those members of the class who executed the release in exchange for the opportunity to enroll in the new plan provided by the Company. The defendants contend that

valid consideration exists for the release where the Company offered the retirees participation in an insurance program partially funded by the employer. According to the defendants, plaintiff and the other members of his class were afforded thirty days in which they could either accept or reject the Company's offer. In addition, plaintiff Bittinger and others attended a meeting at which legal counsel was present and apprised those members of the potential legal consequences of executing the releases and accepting the terms of the new insurance plan. Alternatively, defendants argue that by retaining the benefits of the terms of the new insurance program plaintiff has ratified the terms of the release. Finally, defendants argue that the acceptance of the new terms of the insurance plan constitutes a valid accord and satisfaction.

In contrast, plaintiff argues that defendants had a "pre-existing duty" to provide fully funded lifetime insurance benefits to the retirees; therefore, the agreement which purported to release all claims against the Company must fail as it was not supported by proper consideration. According to plaintiff, the Company was in derogation of its pre-existing duty to provide fully funded coverage and anything less than fully funded coverage is not sufficient consideration. Second, plaintiff states that the releases were obtained by "moral and economic duress" and are therefore invalid. Plaintiff also states that no ratification can occur where tender of the requisite consideration is neither possible nor required. Finally, with respect to defendants' argument that acceptance of the terms of the letter agreement constitutes an accord and satisfaction, plaintiff states "[t]o characterize the arrogant display of power of a Fortune 500 corporate entity over an elderly former long-term and loyal employee with literally no bar-

12. "UTPHR" refers to the group the United Tecumseh Products Hourly Retirees. The retirees "incorporated the organization for the explicit purpose of obtaining legal advice and

action." *Bittinger v. Tecumseh Products Comp., et. al.,* 915 F.Supp. 885 (E.D.Mich. 1996).

gaining power as a "satisfaction" is absurd." (Pl.'s Resp. at 18).

In order to determine the validity of the release signed by plaintiff and the other members of the class, the Court looks to "[f]ederal law [to] control[ ] the validity of a release of a federal cause of action." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1481 (6th Cir.1989). In a recent Sixth Circuit decision, the Court unequivocally stated "The tender back of consideration received for a signed release is an absolute prerequisite to avoidance of the release under Michigan and federal law...." *Samms v. Quanex Corp.*, 99 F.3d 1139, 1996 WL 599821, * 3 (6th Cir.1996) (copy attached). In *Samms*, the plaintiff, following his termination, executed a release of all claims against his employer in exchange for a substantial benefits package. After receiving benefits under the agreement, Samms brought suit under ERISA alleging that the employer breached its fiduciary duty by modifying the terms of the benefit plan to require employee co-pays in insurance. The Sixth Circuit concluded that Samms was bound by the terms of the release and further stated that if he were to challenge its terms and provisions, "Samms needed to return the consideration he received in order to challenge the release." *Id.* In reaching its conclusion in *Samms*, the Sixth Circuit relied upon the Fifth Circuit's decision in *Wittorf v. Shell Oil Co.*, 37 F.3d 1151 (5th Cir.1994) and the Michigan Supreme Court's decision in *Stefanac v. Cranbrook Educ. Community*, 435 Mich. 155, 458 N.W.2d 56 (1990). In *Wittorf*, the defendant as part of a reduction in force offered certain employees the opportunity to voluntarily terminate their employment in exchange for enhanced severance benefits. In exchange for Wittorf's acceptance of the severance package, he executed a release in favor of the defendant company. Later, Wittorf challenged the terms of the severance package as violative the ADEA, the ADA, and ERISA and filed suit against the company without returning any of the benefits received under the terms of the severance package. In upholding the validity of the release, the Fifth Circuit stated:

> When Wittorf chose to retain and not tender back the enhanced severance benefits paid to him by Shell in consideration for his promise not to file claims against Shell, he manifested his intention to be bound by the Release and Settlement, thus making a new promise to abide by Shell's terms. It is that promise we can enforce.

*Wittorf*, 37 F.3d at 1154. Similarly, in *Stefanac v. Cranbrook Educational Comm.*, 435 Mich. 155, 458 N.W.2d 56 (1990), the Michigan Supreme Court stated "the tender rule set forth here requires that whenever a legal claim is raised in contravention of a settlement agreement, even if joined with an equitable claim, tender is a precondition. Anything less would nullify the purpose of the tender rule." *Id.* at 170, 458 N.W.2d 56. In *Stefanac*, the plaintiff executed a release in conjunction with the termination of her employment in which the plaintiff agreed to forego pursuit of any claims against her employer in exchange for severance pay. Later, plaintiff brought suit against the employer alleging the wrongful termination of her employment. The Court determined that plaintiff was precluded from bringing her claims as she executed the release in favor of the employer and failed to tender the consideration provided for under the agreement before filing suit.

In this Court's opinion, the reasoning employed by the Sixth Circuit in *Samms* and the cases upon which the Sixth Circuit relied in *Samms*, are persuasive to the extent that the Court believes that the tender of consideration is a prerequisite to plaintiff's maintenance of a claim challenging the validity of a release in a non-ADEA context.[13] In the instant

---

**13.** The Court notes that the Sixth Circuit has reached a contrary holding in *Raczak v. Amer-*

case, plaintiff Bittinger and the other members of the class who signed releases, have enrolled in the new insurance plan and have not tendered back the consideration which they received in exchange for their execution of the release. Accordingly, plaintiff Bittinger and the other members of the class who have failed to tender the consideration are barred from challenging the validity of the release.

Plaintiff contends that he is under no obligation to tender the consideration where defendants were under a pre-existing duty to provide fully funded benefits to the retirees. In short, plaintiff contends that a pre-existing duty can never constitute valid consideration upon which defendants may rely to uphold the validity of the release. However, as discussed *infra*, the Court has already determined that the extent of defendants'. obligation was to provide life and health insurance benefits to the retirees for the duration of the 1988–1991 CBA. Upon the expiration of the 1988–1991 CBA, defendants were no longer under any obligation to provide fully funded benefits to the retirees. Following the expiration of the agreement, defendants proposed a new plan the terms of which provided for a 75% contribution on the part of defendants. The Court believes that defendants' offer to fund 75% of the retirees' premium constitutes valid consideration upon which the validity of the release may be upheld. In order to

successfully challenge the execution of the release, plaintiff must tender that consideration which he received as an inducement to sign the release.[14] Neither plaintiff nor the other members of the class which executed releases have tendered the consideration to the defendants. Accordingly, the Court concludes that plaintiff is barred from challenging the validity of the terms of the release.

Finally, defendants seek an entry of summary judgment as to those plaintiffs who are now deceased contending that the terms of the insurance plan "do not provide for surviving dependent coverage." (Df.'s Mot. S.J. at 18). Plaintiff replies by stating that "[t]he plaintiff class has never claimed that surviving spouses were entitled to continued company-paid health care." (Pl.'s Resp. at 19). Accordingly, the Court believes that defendants' motion for summary judgment as to those plaintiffs' who are now deceased is moot.

### Conclusion

For the reasons set forth above defendants' motion for summary judgment as to all of plaintiff's claims shall be granted.

---

*itech Corp.*, 103 F.3d 1257 (6th Cir.1997) in the context of an ADEA claim. The applicability, if any, of the *Raczak* decision is discussed *infra* at Note 14.

14. In so holding, the Court notes plaintiff's reliance upon the Sixth Circuit's decision in *Raczak v. Ameritech Corp.*, 103 F.3d 1257 (6th Cir.1997), in which the Court held, in the context of waiver of claims under the Age Discrimination in Employment Act ("ADEA"), that the tender-back doctrine did not apply to require the plaintiff in *Raczak* to tender his waiver payment as a condition to filing suit. In a recent decision of the Supreme Court, *Oubre v. Entergy Operations, Inc.*, 522 U.S. 422, 118 S.Ct. 838, 139 L.Ed.2d 849 (1998), on the issue of the tender-back doctrine in the context of an ADEA claim, the Court held that

the "OWBPA sets up its own regime for assessing the effect of ADEA waivers, separate and apart from contract law" and concluded that "[t]he statute governs the effect of the release on ADEA claims, and the employer cannot invoke the employee's failure to tender back as a way of excusing its own failure to comply." After the Supreme Court's holding in *Oubre*, it is clear that in the context of ADEA claims, tender back of consideration is not required. What remains unclear after *Raczak* and *Oubre* is the extent to which, if any, the Court's reasoning is applicable to waivers and/or releases in the non-ADEA context. In light of the lack of explicit guidance from the Sixth Circuit on this issue, the Court declines to extend the reasoning of the *Raczak* decision to the facts of the instant case.